J-A03031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.D., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.H., MOTHER | : | No. 2336 EDA 2024 |

Appeal from the Order Entered August 21, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001819-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: M.S.-S.D., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.H., MOTHER | : | No. 2337 EDA 2024 |

Appeal from the Decree Entered August 21, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000091-2022

BEFORE:  STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.:           **FILED MARCH 10, 2025**

S.H. ("Mother") appeals from the decree involuntarily terminating her parental rights to her daughter, M.S.-S.D. ("Child"),[1] born in 2009, and the order changing Child's permanency goal from reunification to adoption.  We affirm the termination decree and dismiss Mother's appeal from the goal change order as moot.

---

[1] Child is identified as M.D. in the dependency proceeding and M.S.-S.D. in the termination proceeding.  We use Child's initials from the termination proceeding, which corresponds with the name on her birth certificate.

The certified record reveals the following relevant factual and procedural history.  On August 5, 2018, the Philadelphia Department of Human Services ("DHS") received a report that Mother and her six children, including Child, were residing in an uninhabitable home.  DHS visited the home and obtained orders of protective custody for the six children.  On August 16, 2018, the trial court adjudicated Child and her siblings dependent and returned them to Mother's care.

On February 6, 2019, the trial court again obtained orders of protective custody for Child and her siblings based on the uninhabitable living conditions of Mother's home.  The trial court committed Child and her siblings to DHS' custody, and Child has remained in foster care since February 2019.

At subsequent permanency hearings, the trial court referred Mother for a parenting evaluation and parenting courses.  The court further ordered Mother to engage in mental health treatment and allowed her supervised visitation and telephone contact with Child, at Child's discretion.

DHS filed prior petitions to terminate Mother's parental rights to Child and change her permanency goal to adoption, which the trial court denied in December 2022.  At the July 2023 and February 2024 permanency hearings, the trial court found Mother to be completely non-compliant with her single case plan objectives and to have made no progress towards reunification.  Furthermore, Child expressed at the February 2024 permanency hearing her wish to be adopted by her current resource parents.  DHS filed the instant termination and goal-change petitions on May 10, 2024.

The trial court held a hearing on the petitions on August 21, 2024, at which the following witnesses testified: Sharan Robinson ("Robinson"), the Community Umbrella Agency ("CUA") case manager and supervisor; Dominique Miller ("Miller"), the current CUA case manager; and Mother.[2] Robinson testified that Mother had not complied with any of her single case plan objectives, which included obtaining a mental health assessment, completing parenting courses, and obtaining adequate housing and employment. Robinson stated that Mother has refused to communicate with her CUA case managers. Mother also does not communicate with Child's resource parents and has not provided financial support for Child over the life of the case. CUA is unaware of Mother's current housing status due to her lack of contact with the agency.

Robinson testified that Child has not had contact with Mother since November 2023, coinciding with Child's placement with her current resource parents. According to Robinson, Child "chose not to continue visits with [M]other because she wanted to be adopted." N.T., 8/21/24, at 11.

Robinson testified that Child's current resource parents provide Child with safety and stability and meet her basic daily needs. Child shares a

_____

[2] The trial court appointed legal interests counsel to represent Child at the hearing, in addition to a guardian *ad litem*. ***See In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020) (providing that appellate courts shall engage in *sua sponte* review to determine if trial courts have appointed counsel to represent a child's legal interests in contested termination proceedings).

parent-child bond with her resource parents. Both Child and her resource parents wish to pursue adoption.

Miller, Mother's current case manager, testified that she has had no contact with Mother. Miller stated that she most recently called Mother during the week of the hearing and Mother hung up when Miller identified herself. Miller sent a follow-up text message to Mother to discuss the singe case plan objectives, but Mother did not respond. Notwithstanding Mother's lack of communication with her case managers, Mother communicated with the CUA visitation coach every week regarding visitation for her other two children who remained in foster care.

Miller visited the resource home three weeks before the hearing. She found that Child was safe in the resource home and the resource parents were meeting Child's daily needs.

Mother testified that she only speaks with Robinson when she has "issues with the children at visitation, like scratches on [the] children, stuff like that." *Id*. at 21. Mother stated that she had not been in touch with CUA for any issues aside from visitation since 2021. Mother stated that Miller called her the day prior to the hearing, but the "phone call hung up." *Id*. at 23.

Mother testified that she had completed parenting classes and mental health counseling and submitted to drug testing. When asked what progress Mother had made towards obtaining adequate housing, Mother stated that she "had housing" in the past. *Id*. at 21. Mother attributed her inability to

maintain housing to CUA's failure to provide her with promised rent stipends during the second wave of the COVID-19 pandemic in 2021 and 2022.

On the same date as the hearing, the trial court entered a decree involuntarily terminating Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[3]  By an order entered on the same date, the court changed Child's permanency goal to adoption.

Mother filed timely notices of appeal and concise statements of error complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), and the trial court filed an opinion pursuant to Rule 1925(a).  This Court consolidated Mother's appeals *sua sponte*.

Mother raises the following issue for our review:

> Did the [trial] court err in granting the goal change and termination of Mother's parental rights on the environmental grounds which were not in control of Mother where CUA and DHS failed to provide effective or adequate housing, visitation and social services to Mother and DHS failed to meet its burden of proof as to the other grounds for terminating Mother's parental rights?

Mother's Brief at 6 (unnecessary capitalization omitted).

Mother first challenges the decree involuntarily terminating her parental rights to Child.  When reviewing a decree terminating parental rights, we

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual

---

[3] By separate decrees, the trial court also confirmed the consent of D.D. ("Father") to voluntarily terminate his parental rights to Child and terminated the rights of all other unknown putative fathers of Child.  Father did not participate in the instant appeal or file a separate appeal.

findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

. . . [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (citations omitted).

We apply a bifurcated analysis to determine whether termination of parental rights is proper under Section 2511.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id*. (citation and brackets omitted). To satisfy the clear and convincing evidence standard, the petitioner must present evidence that is "so clear,

- 6 -

direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id***. at 56-57 (citation omitted).

The trial court determined that DHS met its burden to terminate Mother's parental rights under Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court's decision as to any one subsection of Section 2511(a), in addition to subsection (b), to affirm the termination of Mother's parental rights. ***See id***. at 57. Accordingly, we examine the propriety of the court's ruling under subsections (a)(1) and (b), which provide:

> **(a) General rule.—**The—rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * * *
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

To satisfy Section 2511(a)(1), the petitioner must present clear and convincing evidence that the parent's conduct in the six-month period prior to the filing of the termination petition revealed either: (1) a settled purpose of relinquishing the parental claim to the child; or (2) a failure or refusal to perform parental duties. *See Interest of C.S.*, 327 A.3d 222, 237 (Pa. Super. 2024). While courts should avoid a "mechanical application" of the six-month statutory provision, "the most critical period for evaluation is the six months immediately preceding the filing of the termination petition." *In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021).

With respect to a parent's performance of parental duties, our Supreme Court has explained:

> . . . [O]ur courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions and develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*Id*. (citations, quotation marks, and brackets omitted).

"The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of her parental rights, to determine if the evidence, in light of the totality of the

- 8 -

circumstances, clearly warrants the involuntary termination." **C.S.**, 327 A.3d 237 (citation and brackets omitted).

> Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b).

**L.A.K.**, 265 A.3d at 593.

The Section 2511(b) analysis considers the matter from the child's perspective and places the child's developmental, physical, and emotional needs over the concerns of the parent. **See K.T.**, 324 A.3d at 59. The trial court must consider the emotional bond between the parent and child, with the threshold for the bond inquiry being whether termination will sever a necessary and beneficial relationship. **See id**. at 59-60.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care . . . ; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

**Id**. at 59 (citation omitted).

Mother argues that the trial court erred by terminating her parental rights to Child when DHS and CUA failed to sufficiently assist her in achieving her housing, social services, behavioral health care, and visitation goals. With respect to housing, Mother contends that CUA stopped providing her services

in 2021 or 2022 during the COVID-19 pandemic and the services never resumed. Mother asserts that termination in this case violated Section 2511(b)'s prohibition on termination solely based on inadequate housing. *See* 23 Pa.C.S.A. § 2511(b) (providing, "The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing . . . if found to be beyond the control of the parent").

The trial court stated in its opinion that it did not terminate Mother's parental rights solely based on inadequate housing but also because of Mother's failure to meet her parenting, employment, and mental health objectives. The court observed that the evidence showed that Mother declined any assistance from CUA to complete the objectives that would lead to her reunification with Child. Finally, the court stated that the record contradicted Mother's claim that CUA denied her visitation services as Child discontinued visitation with Mother nine months prior to the termination hearing.

Based on our review, we conclude that DHS met its burden under Section 2511(a)(1) of showing that Mother failed to perform parental duties for Child in the six months prior to the filing of the termination petition. *See C.S.*, 327 A.3d at 237.

Initially, we agree with the trial court that the termination was not based *solely* on Mother's inadequate housing as the evidence showed that she had not made progress on *any* of her single case plan objectives, which included obtaining a mental health assessment, completing parenting courses, and obtaining adequate housing and employment. *See In re Adoption of C.J.P.*,

- 10 -

114 A.3d 1046, 1055 n.8 (Pa. Super. 2015) (stating that Section 2511(b) is not an impediment to termination of parental rights based on a combination of environmental and non-environmental factors). Mother refused to communicate with CUA on any issue beside visitation, despite numerous attempts by CUA to contact her. Indeed, Mother admitted during her testimony that she was last in contact with her CUA case manager in 2021.

Furthermore, Mother failed to maintain contact with or otherwise support Child. Child chose to discontinue visitation with Mother in November 2023, upon Child's placement with her current, pre-adoptive resource parents. Significantly, Mother did not progress beyond supervised visitation, at Child's discretion. Mother also does not communicate with Child's resource parents and has not provided financial support for Child for the duration of the case.

Mother's only explanation for her failure to meet her objectives was that CUA did not provide a housing stipend in 2021 and 2022 due to the COVID-19 pandemic. However, this claim does not justify Mother's failure to follow-up with CUA regarding housing after 2022. Moreover, Mother did not offer any explanation for her inability to achieve her other objectives, maintain regular communication with CUA, and support Child. Simply put, the record demonstrates that Mother failed to act with "reasonable firmness" to overcome the obstacles that stood in the way of preserving her relationship with Child. *L.A.K.*, 265 A.3d at 592 (citation omitted).

Although Mother does not present an independent challenge to the trial court's ruling under Section 2511(b), our subsection (a)(1) analysis requires

consideration of "the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *L.A.K.*, 265 A.3d at 593. Therefore, we review the record to assess whether DHS presented clear and convincing evidence that termination best served Child's needs and welfare.

Based on our review, we conclude that DHS met its burden under Section 2511(b). While Child did have a relationship with Mother in the past, Child unilaterally decided to discontinue visitation with Mother to allow for adoption by the resource parents. Therefore, although Mother continued visiting her other children who remained in foster care, she and Child had no contact during the nine months prior to the termination hearing.

Child met her resource mother at her school, where the resource mother became a "support system" for Child. N.T., 8/21/24, at 13. The resource parents provided Child with a structured environment, an active family life, and met all of Child's basic needs. The resource parents ensured that Child was safe and secure, and Child had parent-child bonds with the resource parents. Furthermore, both Child and the resource parents sought to pursue adoption.

Robinson opined that Child would not suffer irreparable harm if the trial court terminated Mother's parental rights "[b]ecause there's currently no contact. [Child] requested to be adopted. She's [fifteen years old] now, and she doesn't wish to be in communication with [M]other at this time." *Id*. at 14-15. Robinson believed that removing Child from the resource family would

interrupt the stability she had finally achieved and deny her the permanency she deserved after five and one-half years in foster care.

Given the length of time Child spent outside of Mother's care, the absence of any current relationship between Child and Mother, and the fact that Child is thriving in her pre-adoptive resource family, the evidence supported the trial court's conclusion that termination of Mother's parental rights best served Child's needs and welfare. We therefore conclude that the trial court did not err or abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(1). *See K.T.*, 324 A.3d at 56. Mother's appeal from the termination decree thus merits no relief.

Mother next challenges the trial court's order changing Child's permanency goal from reunification to adoption. Given our disposition of Mother's appeal from the termination decree, we conclude that her appeal from the goal change order is moot. *See Interest of A.R.*, 311 A.3d 1105, 1114 (Pa. Super. 2023) (holding that affirmance of termination of parental rights renders moot trial court's decision to change child's permanency goal to adoption). We thus dismiss this appeal.

Based on the foregoing, we affirm the decree terminating Mother's parental rights and dismiss as moot Mother's appeal from the order changing Child's permanency goal from reunification to adoption.

Termination decree affirmed. Appeal from goal change order dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>3/10/2025</u>